# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN A. JAMIESON, | ) 1:06cv1432 OWW DLB |
| | ) |
| Plaintiff, | ) FINDINGS AND RECOMMENDATION<br>) REGARDING PLAINTIFF'S<br>) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| MICHAEL J. ASTRUE, Commissioner<br>of Social Security, | ) |
| | ) |
| Defendant. | ) |

## BACKGROUND

Plaintiff John A. Jamieson ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate Judge for findings and recommendation to the District Court.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed his application for supplemental security income on April 28, 2004, alleging disability since May 24, 2003, due to "excessive movement of tendons, whiplash and damage to tendons around [his] atlas-vertebra at base of skull." AR 71-80. After being denied

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 34-38, 40-45, 46. On January 23, 2005, ALJ Daniel Heely held a hearing. AR 303-322. ALJ Heely denied benefits on April 26, 2006. AR 21-31. On August 17, 2006, the Appeals Council denied review. AR 14-16.

<u>Hearing Testimony</u>

ALJ Heely held a hearing on January 23, 2005, in Stockton, California. Plaintiff appeared with his attorney, Harvey Sackett. AR 303.

Plaintiff testified that he was born in 1965 and graduated high school. He lives at home with his wife and children, ages 13 and 9. His wife is disabled and does not work. He helps her with what he can around the house, and their children help, too. He cooks a little and does dishes on occasion. AR 307. He lives in the mountains and climbs the 24 steps to his house about six times a day. He has a driver's license and drives three to four times per week, up to half an hour a time. AR 308. He takes his daughter to school and picks her up, goes to the post office and thought he could run about three or four errands in half an hour. AR 308. He usually drives an SUV, but drives a standard shifting truck once a week to take his garbage to the dock. AR 309. He is able to rake the pine needles in his yard for about an hour before needing to lay down. AR 311-312. He goes shooting twice a year, although he can no longer hunt. AR 312. He can no longer load his own gun because he can't work the press handle. AR 313.

Plaintiff last worked in May 2003, before his accident, building houses. AR 309. They have been living off their savings account and help from family. AR 310.

Plaintiff had surgery in September that helped a little by taking the edge off of his worst pains. AR 311. He is still taking prescription medications. AR 311. During the day, he watches television and occasionally uses the computer to play games. AR 313. He goes to school functions for his daughter, but does not go to church. He has gone to Reno once or twice since he last worked, but not in the past year since his pain has worsened. AR 314. He also drove to San Jose three or four times a year for the past few years to care for his mother-in-law. AR 315.

When questioned by his attorney, Plaintiff explained that he used to play video games with his son for hours before he got hurt, but he can no longer do so. If he tries to do it for a

short time, he gets severe pain in his head and has to lay down.  AR 316.  Even though he helps his wife with the dishes and cooking, it causes pain behind the base of his skull.  He has constant pain that turns into migraines.  AR 317.  The pain does not travel below his neck.  AR 317.

Plaintiff explained that just sitting in one position increases his pain.  He can't hunch over forward.  Even if he could change positions, he could not stand/sit for eight hours a day.  He explained that since his surgery, his pain has eased but has not been eliminated.  Although he is able to take less pain medications, his ability to function has not changed.  AR 319.  Everything he does causes pain, unless he is laying down.  AR 319-320.

Medical Evidence

Plaintiff was involved in an automobile accident on May 24, 2003.  The car he was driving was hit from the side and rolled down an embankment.  AR 160.  He was seen in the emergency room and discharged in good condition.  AR 196-204.

Plaintiff began seeing C.A. Cunnington, M.D., on May 27, 2003, and complained that he hurt all over.  He prescribed Vicodin and continued to do so through December 2003.  AR 167-169.

Plaintiff began treatment with chiropractor Margaret A. Hornick, D.C., on June 5, 2003.  He complained of a sore neck, back and shoulder and headaches at the base of his skull as a result of his automobile accident.  AR 130.

In August 2003, Dr. Hornick diagnosed cervical strain and myofascitis.  She anticipated complete recovery by December 30, 2003.  AR 132.

On August 25, 2003, Plaintiff underwent an MRI of his cervical spine.  The test revealed mild disc narrowing at C4-5 and C5-6 levels and mild associated left-sided foraminal encroachment present on an acquired basis at the C5-6 level.  AR 162.

On September 22, 2003, Plaintiff was evaluated by neurologist Moris Senegor, M.D. Plaintiff reported that he has neck pain and pain at the back of his head, but that his symptoms were much improved since the accident.  Upon examination, range of motion of the cervical spine was "reasonably good," and there was no tenderness or muscle spasm.  Gait and coordination were normal and his sensory examination was negative.  Mental status was normal.

Muscle strength was 5/5 throughout. Dr. Senegor reviewed the August 2003 MRI and opined that Plaintiff has "persistent cervical myofascial strain syndrome in relationship to cervical degenerative disc disease." He further opined that the problem was "relatively mild and not in need of any invasive treatment such as surgery or epidural steroid injections." Dr. Senegor recommended that Plaintiff continue with chiropractic treatment and that he attempt to return to work at some point to assess whether or not the heavy physical load of his job as a construction carpenter would be compatible with his degenerative disc problems. AR 178-179.

Plaintiff began physical therapy with Janet Lee, P.T., in December 2003. AR 277. He indicated that was planning to return to work, but that he might look for an easier career. AR 277.

On January 19, 2004, Plaintiff reported to Dr. Cunnington that any work activity causes a severe headache that lasts 24 hours and requires Vicodin sedation to control the pain. AR 167.

On January 27, 2004, Plaintiff underwent videofluoroscopy of his cervical spine. Among other things, the test revealed a 4 mm left lateral displacement of C1 and C2 on left lateral bending and a 1 mm right lateral displacement of C1 and C2 on right lateral bending that would indicate ligamentous and/or capsular laxity bilaterally and/or a sprain/strain and compromization, especially on the left. These findings could correspond to Plaintiff's symptomatology of suboccipital pain. AR 138-141.

In March 2004, Plaintiff underwent a cervical epidural injection. AR 135-137, 188-189. The block left him with more pain. AR 255.

In April 2004, Dr. Cunnington noted that Plaintiff was "still unemployable." He could not bend forward and had limited motion neck in his neck, in all directions, with pain. AR 166.

On August 18, 2004, Plaintiff saw neurosurgeon Randal R. Peoples, M.D., for complaints of pain at the base of his skull to the left of the midline. He complained of a constant throbbing that "flares up" depending on his activity level. Upon examination, range of motion in the cervical spine was full, but he clearly had hesitation with cervical hyperextension. Plaintiff explained that based on his experience, such movement triggers pain that lasts for hours. He had full strength in all extremities with normal tone and no atrophy. Palpation just at and below the

nuchal line was tender with deep palpation.  Plaintiff explained that this triggers a deep ache that evolves into significant pain and discomfort of the scalp, tightening of the muscles and headache. Dr. Peoples reviewed the August 2003, MRI of Plaintiff's spine and noted that the quality was suboptimal, but opined that there did not appear to be any significant disc herniation or displacement of the spinal cord.  He diagnosed occipital neuritis.  Dr. Peoples believed that his symptoms were related to a crush injury, possible neuroma, and hyperthesias of the greater occipital nerve on the left.  He suggested a block of the greater occipital nerve in anticipation of a more permanent solution, i.e., nerve stimulator.  He also recommended a repeat MRI of his cervical spine.  AR 213-215.

      Plaintiff saw David J. Oliveri, M.D., for evaluation of his injuries on August 19, 2004. Plaintiff complained of severe, debilitating headaches that start on the left side of the skull base and travel into the left side of his head, as well as constant left-sided neck pain that worsens with any use of his upper extremities.  Upon examination, there was tenderness at the left upper cervical paraspinals and left suboccipital area.  Range of motion was limited and extension and flexion to the left side increased left-sided neck pain.  His gait was normal and sensory was intact.  Dr. Oliveri diagnosed severe left occipital neuralgia, probable left upper cervical facet syndrome and a concussion with loss of consciousness.  He explained that he needed to obtain his treatment records to render treatment recommendations.  In general, though, he would probably recommend repeating some injections around the occipital nerve and perhaps the upper cervical facet joints.  Plaintiff may be a candidate for an occipital nerve stimulator.  AR 183-185.

      On August 20, 2004, Plaintiff underwent a psychological evaluation conducted by Louis F. Mortillaro, Ph.D.  Responses to testing suggested that he was asymptomatic for feelings of anxiety and depression.  Mental status examination revealed an apprehensive mood and a rather blunted affect.  His communication was not impaired, his thought processes were organized, logical and goal-directed, and his thought content was appropriate to his mood and circumstance. He was oriented to person, place, time and situation.  His coping abilities were "rather exhausted, overwhelmed and deficient at this time."  Dr. Mortillaro diagnosed pain disorder due to medical

condition with psychological factors and psychosocial stressors. His current GAF was 45. AR 191-193.

Dr. Mortillaro explained that Plaintiff's pain was causing him clinically significant distress or impairment in social, occupational and other areas of functioning. He did not believe that his symptoms or deficits were intentionally produced. Dr. Mortillaro believed that Plaintiff would benefit from individual pain management counseling and biofeedback therapy to teach him ways to successfully control his pain and pain-related stress. Plaintiff would also benefit from an antidepressant evaluation. AR 194.

On September 2, 2004, Dr. Hornick wrote a letter indicating that Plaintiff was permanently disabled from any physical work, explaining that he has permanent damage of the cervical ligaments and that any lifting or bending brings on severe headaches. His mental capabilities did not seem to be affected by his injuries. AR 129.

Plaintiff saw Christopher J. Krpan, D.O., on September 14, 2004. Upon examination, Plaintiff had full range of motion of the shoulders. He had markedly limited range of motion and extension of the neck and was markedly apprehensive about moving his neck because it causes pain. Dr. Krpan diagnosed left occipital neuritis and recommended a repeat MRI. He was given a referral to Dr. Orman for pain management. Dr. Krpan further recommended that Plaintiff try to get off the narcotic pain medications because they were addictive and would not cure his problem. AR 220-222.

Plaintiff underwent an MRI of his cervical spine on September 29, 2004. The test suggested developmental fusion at C2-3, a small posterior central disc protrusion at L5-6 mildly eccentric towards the right, mildly indenting the thecal sac, a small disc bulge at C6-7 where there appears to be at least moderate narrowing of the left neural foramen, and a small disc bulge at C3-4. AR 223.

Plaintiff underwent a left occipital nerve block in October 2004 that provided him with complete relief for an hour or two, followed by partial relief sustained for a few days. AR 255.

On October 22, 2004, State Agency physician Alfred Torre, M.D., completed a Physical Residual Functional Capacity assessment. He opined that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk about six hours, and sit for about six hours. He could not operate hand controls or perform overhead reaching with his upper extremities. He was limited in reaching in all directions. AR 226-233. This opinion was affirmed on January 20, 2005, by State Agency physician Brian Ginsburg, M.D. AR 233.

On November 5, 2004, State Agency physician Glenn Ikawa, M.D., completed a Psychiatric Review Technique form. He determined that Plaintiff had an affective disorder but that it was not severe. Dr. Ginsburg affirmed this opinion on January 20, 2005. AR 234.

On February 16, 2005, Plaintiff saw Nicholas Barbaro, M.D., at UCSF Medical Center, Department of Neurological Surgery. On examination, there was some tenderness in the area of the upper medial trapezius muscle on the left side, however there was no radiating pain. There was no sensory deficit to light touch or pinprick in the greater occipital nerve distribution. Dr. Barbaro opined that Plaintiff had posttraumatic headaches rather than occipital neuralgia. He based this on the fact that the pains go outside of the region of the occipital nerve deficit. He suggested that Plaintiff be referred to a neurologist who specialized in headache management and that Plaintiff be tried on a variety of medications, including Neurontin or more specific antimigraine medications. Dr. Barbaro believed that surgical intervention, such as a nerve ablative procedure or any kind of stimulation, should not be considered at this time, and that Plaintiff would be better served by trying more typical antiheadache medications. AR 301-302.

In March 2005, Plaintiff was seen at Stanford Outpatient Neurosurgery Clinic. AR 255. After examining Plaintiff, Dr. Henderson recommended a trial of medications, including Neurontin. If medications did not help, Dr. Henderson suggested a left occipital nerve stimulator. AR 257.

In April 2005, Plaintiff told Dr. Cunnington that the Neurontin did not help. AR 275. In May 2005, Plaintiff had tenderness in his neck muscles but good range of motion. AR 275. In June 2005, he reported that he felt worse with more exercise. AR 275. During this time, Dr. Cunnington continued to prescribe pain medication. AR 275.

In September 2005, Plaintiff underwent a procedure to place a left occipital nerve stimulator electrode. Plaintiff achieved very good pain relief with the trial stimulation and decided to have a permanent electrode placed. AR 282.

Plaintiff returned to Stanford in October 2005. He reported that he had significant pain relief on very low voltage settings, but he had not yet increased his activity level. Dr. Henderson instructed Plaintiff to continue to wean off the narcotics as tolerated and to increase his activity level over the next few weeks. Dr. Henderson noted that, overall, Plaintiff had good success in improving his comfort at the present time. AR 284.

In December 2005, Dr. Cunnington noted that Plaintiff had less neck pain and was weaning off medication. AR 296.

On January 12, 2006, Dr. Cunnington completed a Physical Residual Functional Capacity Questionnaire. He indicated that Plaintiff's prognosis was guarded and opined that he was incapable of even low stress jobs because of his constant pain and medication sedation. His walking was limited because he had to lie down when he had headaches. He could sit for less than two hours in an eight hour day and stand for less than two hours. He would need to take unscheduled breaks every one to two hours to lie down, for two to three hours at a time. He could occasionally lift less than 10 pounds. He had significant limitations in repetitive motions because they cause headaches. He further opined that Plaintiff had bad days all the time, and explained that any movement of his neck causes a headache and dizziness. AR 289-294.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of occipital neuralgia and degenerative disc disease. He further found that Plaintiff's allegations and those of third parties were not entirely credible. Based on his review of the evidence, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to sit, stand and walk for six hours each, lift/carry 20 pounds occasionally and 10 pounds frequently, and occasionally reach overhead. Although Plaintiff could not perform his past relevant work, the ALJ determined that he could perform a significant range of light work. AR 30-31.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20

C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Here, the ALJ determined that Plaintiff (1) had not engaged in substantial gainful activity since the alleged onset of disability; (2) has an impairment or a combination of impairments that is considered "severe" (occipital neuralgia and degenerative disc disease) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work; but (5) retains the RFC to perform a significant range of light work.  AR 30-31.

Plaintiff argues that the ALJ (1) improperly analyzed his mental impairment; (2) improperly analyzed the evidence relating to his occipital neuralgia; and (3) improperly analyzed his credibility.

## DISCUSSION

A.   Plaintiff's Mental Impairment

Plaintiff first argues that substantial evidence does not support the ALJ's finding that his mental impairment was not a severe impairment.  Specifically, Plaintiff contends that it was legal error for the ALJ to base his decision on the opinion of Dr. Ikawa, the State Agency physician.

In finding Plaintiff's mental condition non-severe, the ALJ gave "substantial weight" to the opinion of Dr. Ikawa and "little weight" to the opinion of examining psychologist Dr. Mortillaro.  AR 28-29.  Like the opinion of a treating physician, the opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984).  As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician.  *Pitzer*, 908 F.2d at 506.  And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.

10

*Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456. In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor. *E.g., Magallanes v. Bowen,* 881 F.2d 747, 751-55 (9th Cir.1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir.1995). For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians...." *Magallanes*, 881 F.2d at 752 (emphasis in original). Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion. *Id*. at 751-52.

Here, in finding that Plaintiff's mental impairment was not severe, the ALJ concluded as follows:

> The undersigned finds that claimant's mental condition causes the claimant to experience no restrictions in the claimant's activities of daily living; mild difficulties maintaining social functioning; and mild difficulties in maintaining concentration, persistence or pace. The claimant has not had an episode of decompensation of extended duration.

AR 29.

In so finding, the ALJ gave substantial weight to the opinion of Dr. Ikawa, who opined that Plaintiff's affective disorder was not severe. AR 235. He gave little weight to Dr. Mortillaro, who diagnosed Plaintiff with pain disorder and opined that he was impaired in social, occupational and other areas of functioning. AR 191-193.

While the ALJ rejected Dr. Mortillaro's opinion, he did not do so based solely upon Dr. Ikawa's finding. *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (the findings of a nontreating, nonexamining physician can amount to substantial evidence so long as other evidence in the record supports those findings). In rejecting Dr. Mortillaro's opinion, the ALJ explained that the severity of his findings was not supported by the medical records, nor were his findings consistent with other substantial evidence in the record. AR 29. For example, as Dr. Ikawa explained, Plaintiff did not take psychiatric medication or receive other mental health treatment. AR 246. Indeed, Plaintiff testified that he did not receive any mental health

11

treatment. AR 312.² Dr. Senegor, a neurosurgeon who examined Plaintiff in September 2003, noted that his "mentation and mental status are normal."³ AR 266. Similarly, in September 2004, Dr. Hornick noted that Plaintiff's "mental capabilities did not seem to be affected by his injuries." AR 129.

Additionally, the ALJ explained that Plaintiff's daily activities were not restricted by any alleged mental impairment. For example, Plaintiff testified that he takes his daughter to school and picks her up, and routinely runs errands. AR 308. He occasionally uses the computer to play games and goes to school functions for his daughter. AR 313-314. In February 2005, Plaintiff completed a new patient questionnaire for Dr. Barbaro. He indicated that he had no psychosocial symptoms (i.e., depression, anxiety or mood swings). AR 261. He further indicated that his disorder placed stress on his relationships with family and friends "some" of the time and made him feel depressed "some" of the time.⁴ AR 263. The ALJ was reasonable in concluding that Plaintiff's daily activities and self-reports did not support a severe mental impairment.

So, then, while Plaintiff is correct that the ALJ cannot reject an examining physician's opinion based only on the opinion of a non-examining physician, the ALJ did not do so here. Plaintiff also misstates the record when he states that there was "virtually no explanation for the non-examining physician's assessment." Opening Brief, at 17. Although Dr. Ikawa's final conclusion was set forth on a form, it was accompanied by a Disability Determination Rationale

---

² In his reply, Plaintiff cites *Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir. 1996), where the Ninth Circuit explained that given the nature of the disease of depression, many people do not seek treatment because they do not recognize their illness, and that this failure to seek treatment is not a substantial basis upon which the ALJ could reject the examining physician's opinion. Unlike *Nguyen*, Plaintiff's own testimony and activities belie his allegation of a severe mental impairment.

³ Plaintiff faults Defendant's citation of Dr. Senegor's finding and questions whether Dr. Senegor's opinion should be given greater weight than that of Dr. Mortillaro, "a psychologist . . . who included the administration of standardized psychological tests." Reply, at 2. Yet the ALJ did not necessarily give Dr. Senegor's finding greater weight. Defendant's citation to Dr. Senegor's finding was made to support the ALJ's finding that Dr. Mortillaro's opinion was not consistent with the medical evidence.

Plaintiff also argues that "Defendant conveniently avoids Dr. Mortillaro's statement that 'the results of this evaluation are a valid and reliable sample of his current level of psychological functioning.'" Reply, at 2. Dr. Mortillaro's statement, though, does not change the fact that his opinion was not supported by either the medical evidence or Plaintiff's own testimony.

⁴ The choices included "not at all, a little bit, some, quite a lot or severe." AR 263.

12

in which he reviewed the medical evidence, including Dr. Mortillaro's report, and concluded that Plaintiff could handle stress and change in routine and could concentrate all day long. AR 245-246. In so finding, he agreed with the reviewer's conclusion that Plaintiff was a good historian at his psychological evaluation, that his mental issues were situational and due to a physical condition, and that he was not taking psychiatric medications or receiving treatment. AR 246. Dr. Ikawa further explained that according to Plaintiff's statement of activities of daily living dated October 27, 2004, he home schools his son, takes his daughter to and from school, takes care of his wife and children, drives, pays bills and does some chores. AR 102, 246.

The ALJ's assessment of Plaintiff's mental impairment is supported by substantial evidence and is free of legal error.

B.   <u>Analysis of Plaintiff's Occipital Neuralgia</u>

Plaintiff next argues that the ALJ improperly analyzed his occipital neuralgia. In that regard, he contends that the ALJ did not give appropriate weight to Dr. Cunnington's January 2006, assessment and failed to fully develop the record.

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995). Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).

If a treating physician's opinion is not giving controlling weight because it is not well supported or because it is inconsistent with other substantial evidence in the record, the ALJ is instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating physician. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. 20 C.F.R. 404.1527(d)(2)(i)-(ii). Other factors include the supportablility of the opinion, consistency with the record as a whole, the specialization of the physician, and the extent to which the physician is familiar with disability programs and evidentiary requirements. 20 C.F.R. § 404.1527(d)(3)-(6). Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to deference." SSR 96-2p; *Orn v. Astrue*, 495 F.3d 625, 632-633 (9th Cir. 2007). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p; *Orn*, 495 F.3d at 633.

In assessing Plaintiff's physical limitations, the ALJ rejected the assessment of Dr. Cunnington, his treating physician, in favor of the opinion of State Agency physician Dr. Torre. AR 28. The ALJ set forth Dr. Cunnington's January 2006, assessment, and explained that he gave it "reduced weight" as his findings were not "consistent with the claimant's medical records and are too extreme." AR 28.

As the ALJ noted, Dr. Cunnington's severe limitations were not consistent with the overall medical record. *Batson v. Comm'r*, 359 F.3d 1190, 1197 (9th Cir. 2004) (it is permissible to give treating physicians' opinion minimal evidentiary weight in light of the objective medical evidence and the opinions and observations of other doctors). For example, in August 2003, Dr. Hornick diagnosed cervical strain and myofascitis, but anticipated complete recovery by December 30, 2003. AR 132. On September 22, 2003, Dr. Senegor noted "reasonably good" range of motion of the cervical spine, with no tenderness or muscle spasm. He opined that the problem was "relatively mild and not in need of any invasive treatment such as surgery or epidural steroid injections." He recommended that Plaintiff attempt to return to work at some

14

point to assess whether or not the heavy physical load of his job as a construction carpenter would be compatible with his degenerative disc problems. AR 178-179. In December 2003, Plaintiff told his physical therapist that he was planning to return to work, but that he might look for an easier career. AR 277. Moreover, while there are also numerous findings of tenderness and limited range of motion, no other physician imposes such strict limitations.

Dr. Cunnington's January 2006, assessment is further contradicted by the medical evidence immediately preceding the assessment. Plaintiff had a left occipital nerve stimulator placed in September 2005, after achieving very good pain relief with the trial stimulation. AR 282. When he returned to Stanford in October 2005, he reported that he had significant pain relief on very low voltage settings, although he had not yet increased his activity level. Dr. Henderson instructed Plaintiff to continue to wean off the narcotics as tolerated and to increase his activity level over the next few weeks. Dr. Henderson noted that, overall, Plaintiff had good success in improving his comfort at the present time. AR 284. In December 2005, Dr. Cunnington noted that Plaintiff had less neck pain and was weaning off medication. AR 296. The most current medical records, including Dr. Cunnington's own records, are in stark contrast to his severe limitations assessed shortly thereafter. A lack of supporting clinical findings is a valid reason for rejecting a treating physician's opinion. *Magallanes,* at 751.

There is no dispute that Plaintiff's impairment results in some limitations. However, Dr. Cunnington's opinion was not supported, even by his own treatment notes. The ALJ therefore set forth specific and legitimate reasons for rejecting it. The Court is mindful of the recent decision in *Orn v. Astrue,* 495 F.3d 625 (9th Cir. 2007), where the Ninth Circuit reiterated the deference that should be given to a treating physician. However, where the treating physician's opinion is not supported in the first instance, as here, *Orn v. Astrue* is not instructive.

Insofar as Plaintiff contends that the ALJ should have further developed the record, he provides no argument or evidence that the record was incomplete or otherwise inadequate to allow for proper analysis. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001) (holding that ALJs have a duty fully and fairly to develop the record only when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence).

C.     Plaintiff's Credibility

Finally, Plaintiff argues that the ALJ impermissibly used a "sit and squirm" test as part of his assessment of Plaintiff's credibility. While he concedes that the ALJ's observations of a claimant at the hearing may be one factor in the credibility analysis, he characterizes the ALJ's remaining factors as either improper or flawed. *See eg. Nyman v. Heckler*, 779 F.2d 528 (9th Cir. 1985).

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints. *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991). "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment," *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (citation omitted). In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir. 1988)). Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

"The ALJ may consider at least the following factors when weighing the claimant's credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.*

As Plaintiff recognizes, the ALJ's observation at the hearing was only one factor relied upon in his credibility assessment. The ALJ stated:

> Another factor influencing the conclusions reached in this decision is the claimant's generally unpersuasive appearance, presentation and demeanor while testifying at the hearing. It is emphasized that this observation is only one among many being relied on in

16

reaching a conclusion regarding the credibility of the claimant's allegations and the claimant's residual functional capacity.

AR 27. The ALJ specifically noted that during the hearing, Plaintiff "reached around with his left hand to the back of his neck and then with both hands to the back of the neck." AR 28. He further noted that during the hearing, Plaintiff "pointed to his left hand and indicated that it used to be painful but not now." AR 26. *Drouin v. Sullivan*, 966 F.2d 1255, 1258-59 (9th Cir. 1992) (ALJ's observations during the hearing, along with other evidence, constitutes substantial evidence). Despite Plaintiff's belief that the ALJ's additional reasons have an "Emperor's clothes veneer," the ALJ set forth sufficient findings to allow the Court to determine that he did not arbitrarily reject his testimony. Opening Brief, at 25.

The ALJ began his credibility analysis by setting forth Plaintiff's daily activities. As the ALJ noted, Plaintiff is able to home school his son, watch television, do some housework and drive a vehicle with a manual transmission. AR 27. Indeed, Plaintiff testified that he drives a truck once a week to take his garbage to the doc and runs errands. He also testified that he takes his daughter to and from school and attends her school functions. AR 308-309. The ALJ reasonably concluded that Plaintiff's daily activities "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." AR 27. *Morgan v. Commissioner of Social Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).

The ALJ next explained that Plaintiff has not generally received the type of medical treatment one would expect for a totally disabled individual. AR 27. *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (ALJ is permitted to consider lack of medical treatment in assessing credibility). Although Plaintiff points to his prescriptions as evidence of the severity of his condition, his medications do not necessarily support a claim of total disability. This is especially true in light of the evidence that after his surgery in September 2005, Plaintiff's pain was lessening and he was weaning off medication. The Court also notes that Plaintiff was referred to pain management more than once yet there is no evidence that he followed through with the referrals. AR 194, 220-222.

Finally, the ALJ explained that the medical evidence did not support Plaintiff's severe allegations of disability. Although the ALJ may not rely solely on lack of medical evidence, he

17

1  may use it as one factor in his analysis. *Lester*, 81 F.3d at 834 (citing *Bunnell v. Sullivan*, 947
2  F.2d 341, 343 (9th Cir. 1991). As the Court has set forth more fully above, the opinion evidence
3  simply does not support Plaintiff's testimony.
4      It is clear from the tone of Plaintiff's opening brief that he vehemently disagrees with the
5  ALJ's findings. However, the ALJ is responsible for resolving conflicts in the medical evidence,
6  and the Court must uphold the ALJ's decision where the evidence is susceptible to more than one
7  rational interpretation. *Magallanes,* 881 F.2d at 750. Plaintiff's disagreement with the outcome
8  does not render the decision improper.
9      Plaintiff's claim is without merit and should be denied.

## **RECOMMENDATION**

11      Based on the foregoing, the Court finds that the ALJ's decision is supported by
12  substantial evidence in the record as a whole and is based on proper legal standards.
13  Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision
14  of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for
15  Defendant Michael J. Astrue and against Plaintiff John A. Jamieson.
16      These findings and recommendations will be submitted to the Honorable Oliver W.
17  Wanger, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within fifteen (15) days after
18  being served with these findings and recommendations, the parties may file written objections
19  with the court. The document should be captioned "Objections to Magistrate Judge's Findings
20  and Recommendations." The parties are advised that failure to file objections within the
21  specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951
22  F.2d 1153 (9th Cir. 1991).

24      IT IS SO ORDERED.
25      Dated:   **October 22, 2007**          **/s/ Dennis L. Beck**
                                              UNITED STATES MAGISTRATE JUDGE